UNITED STATES of America, Plaintiff

v.

Ciro Wayne MANCUSO, aka "C"; Brian John Degen, aka "B"; John Steven Fagan, aka Sean; William George Pearce, Sr., aka Uncle Bill, Robert C. Olsen, Will George, William Buck; Charles W. Roth, aka Chuck; Marcus Ernest Zybach, aka Marco; Jurgen Karl Peter Ahrens, aka Joe the German; Preecha Supkong, aka Supkong Preecha, Cha; Jeffrey John Welch, aka "The Wine Man"; Damyan Stoianoff, aka Dan Stoiano, Danny; James Bradley Stockman, aka Brad; Harry Edward McKeown, aka Ed; Robert Ames Hoffman; Ronald Dean Moore, aka "RD"; Marc Sandhaus, aka "Marc from Lagunitas"; Michael R. Lyons, aka "Bug-Eye Bob"; Robert Zehm, aka Bob; and Michael W. Caldwell, aka "Boy Scout", defendants.

No. CR-N-89-24-ECR.

United States District Court,
D. Nevada.

Nov. 17, 1989.

Dorothy Nash Holmes, Asst. U.S. Atty., Reno, Nev., for plaintiff.

Katherine Alfieri, Patrick Sarsfield Hallinan, Hallinan, Poplack & Levine, San Francisco, Cal., and Donald Cavin Hill, Reno, Nev., for Mancuso.

## ORDER

EDWARD C. REED, Jr., Chief Judge.

The Government has moved the Court for revocation of the order of the Magistrate for release of defendant Ciro Wayne Mancuso. The said motion is made pursuant to 18 U.S.C. § 3145(a)(1). A Magistrate previously conducted a bail/detention hearing. This Court has reviewed the entire record, has considered the findings and orders of the Magistrate and has considered the evidence which was presented during the Magistrate's hearing. This Court has also held an additional evidentiary hearing at which additional evidence was received by the Court and was proffered.

This Court's review of defendant's detention is *de novo*. The review is based upon the evidence proffered and adduced at the hearing held by the Magistrate, as well as upon the additional evidence proffered and adduced at the hearing before this Court.

The offenses of which defendant is charged involve a controlled substance.

If convicted of the charges contained in the superseding indictment, defendant faces a possible sentence of life imprisonment without possibility of parole on one of the counts and lengthy additional terms of imprisonment on numerous other counts.

The weight of the evidence against defendant is not entitled at this stage to weighty consideration. However, there does appear to be substantial evidence of defendant's guilt.

The Court makes the following analysis:

(a) Defendant's physical and mental condition do not appear to be a barrier to defendant fleeing nor do they provide a reason for him to remain in this vicinity.

(b) Defendant has strong family ties in this area, including his wife and two children as well as his parents.

(c) Defendant does not have any regular employment but has been engaged in property development on his own behalf.

(d) Much of defendant's assets have been seized by the government in connection with the present case. However, it may be inferred that defendant still has access to considerable funds which would enable him to flee and to maintain himself elsewhere.

It may be concluded from the evidence that defendant has access to funds and assets in this country which have not been seized for forfeiture by the government. It appears that defendant may have access to funds at the Truckee River Bank whereof he has been able to obtain distributions from a line of credit. While it appears that funds recently withdrawn from the bank on that basis were probably used for business purposes, it does appear that defendant would be able to obtain additional funds.

In recent time defendant has authorized the sale of one of his two Mercedes automobiles in Switzerland and in that connection authorized transfer of 30,000 DM to Jurgen Ahrens and 30,000 DM to Margaret Ahrens, both of whom are European residents. Further, the government has provided convincing evidence, including reference to a document and statements made by a Dr. Vedeker (spelling uncertain; spelling is based upon phonetics) that defendant authorized the transfer of $267,000 from a corporation controlled by him to another person in Europe. It may be inferred that the funds described in this paragraph are available to defendant for his use in Europe. The government has not been able to seize them.

(e) Defendant has been a resident off and on of the Lake Tahoe community for a period of approximately twenty years. However, he has at different times during that period resided in different states and in a foreign country.

(f) It appears that defendant does have community ties to the Lake Tahoe area. Many of his friends and neighbors attest to his good character and contributions to the community. Sixty to seventy members of the community attended a hearing in the Magistrate's court. Fifty letters in support of defendant have been submitted.

(g) There is no indication in the record of any alcohol or drug abuse by defendant.

(h) Defendant was previously arrested in 1969 in Kansas with codefendant Degen for harvesting marijuana. He was fined $1,000 for that offense.

In 1972 defendant was arrested in Guadalajara, Mexico, with ten other persons in possession of 4400 pounds of marijuana and was incarcerated for a year in jail in Mexico on account of that arrest. In 1974 defendant was arrested at Half Moon Bay for possession of cocaine. This arrest was disposed of as a deferred prosecution and a misdemeanor.

(i) There is no indication that defendant failed to appear on previous occasions at required court hearings.

(j) At the time of the offense charged in the superseding indictment defendant was not on probation or parole.

(k) Defendant has undertaken, over a period of several years, extensive foreign travel to Europe, the Far East, Mexico and Canada. He has presently accummulated 248,000 miles on his United Airlines Frequent Flyer Program. He has lived for at least a year in Mexico. Defendant has the requisite knowledge, funds and knowhow to freely travel anywhere in the world. At the time of his arrest he held a partially unused open airline ticket to Hong Kong.

At the time of his arrest defendant also attempted to conceal the passports of his wife, child and himself, together with cashier's checks in a briefcase at his residence after the briefcase had been searched by the officers who were at that time searching his residence.

(l) The defendant has demonstrated that he is readily able to move cash in and out of the country. He has arranged for transfers of large amounts of money including transfer from the Cayman Islands to a Swiss bank of $100,000 on one occasion and separate transfer of $750,000.

In 1986, a coconspirator paid defendant several hundred thousand dollars in Marin County, California. $490,000 of this money was delivered by defendant Roth to Miami for defendant Mancuso for purposes of transferring it out of the country.

(m) Defendant is a licensed pilot. At one time he flew a pressurized plane from the United States to Panama. At the time of his arrest there was discovered in his briefcase a check for $3,000 payable to an individual from whom defendant has been leasing an airplane.

Defendant has contacts in the Cayman Islands, Mexico, Bankok, Switzerland, Australia, New Zealand, Germany, the Phillipines, Spain, England, France, Costa Rica and Hong Kong.

(n) At or just before defendant was arrested he was seeking to destroy certain documents in his fireplace at his residence, including a copy of a statement from Nordfinanz–Bank of Switzerland, which appears

to be a statement for a loan to defendant in an amount in excess of $600,000. Other evidence adduced at the hearing indicated that this document should have been produced pursuant to subpoena issued to defendant, but was not. This document may refer to a fictional deed of trust on defendant's property in the United States wherein defendant's own funds may have actually been advanced for laundering purposes by Nordfinanz–Bank so as to make it look as if defendant owed Nordfinanz–Bank this money.

There was also found at defendant's residence at the time of his arrest partially burned in the fireplace a letter from an individual known as Brad Stockman which alludes to the proposition that in a year or two more in Mexico the problems of defendant and Mr. Stockman will be "worked out" and that "we have it made going back to '86."

Also found in the fireplace partially burned was a letter from Dr. A. Hinderling, dated August 14, 1989, respecting the freezing of assets of defendant (apparently through action of the plaintiff) in Switzerland. References in this letter indicate that there is a "Mortgage Deed" held in defendant's name or for him. This letter may well refer to the aforementioned deed of trust for the sum in excess of $600,000 on defendant's property in the United States which the letter indicates belongs to defendant. The Hinderling letter might also be taken to refer to some other Mortgage Deed owned by defendant in Switzerland. The letter also suggests that it may be possible for defendant to obtain access to the "Mortgage Deed," in spite of the freezing of the asset. It is to be noted in this connection that in recent months defendant went to Switzerland to try to get his money and assets out.

It appears that at the time of or just before his arrest, defendant was attempting to destroy both the Stockman and Hinderling letters.

(o) After his arrest, defendant also endeavored to have a truck removed from his premises to avoid its use as evidence and the danger of potential government forfeiture. He tried to get the arresting agents to allow his wife to drive the truck away contending that it belonged to an innocent third party, "Tahoe Leisure Homes," when in fact the truck actually belonged to defendant.

Just after defendant's arrest defendant was able to persuade the arresting officers to allow his wife to leave the premises and she went to a bank seeking to obtain a cashier's check for $100,000 to replace one that had been seized by the government and which she falsely represented to the bank had been burned.

(p) It is contended by defendant that he will likely stay and face the music rather than fleeing because even though he knew of the investigation of him over a period of several years he has remained here and was actually arrested at his home at Lake Tahoe. The better inference, however, is that defendant stayed, hoping to salvage or conceal as much of his property as he could before leaving and that his arrest came before he could accomplish the liquidation or concealment of assets which he was pursuing. The evidence indicates that defendant was attempting to cash out or conceal a substantial portion of his assets. This conclusion is based in part upon seizure of $194,000 in cashier's checks at the time of his arrest, attempts by defendant to trade Hawaiian property and to cash out Hawaiian assets, and transfers of substantial items of property to family members, including to his parents and children.

(q) The evidence is that defendant in the past has exercised influence over government witnesses. The witness James Vallier was paid a bribe of $140,000 by defendant and codefendant John Fagan to leave the country to avoid his having to testify against them. Quite recently on a separate occasion defendant endeavored to persuade Mr. Vallier not to testify against him and has pled with Mr. Vallier not to "do this to me." It is clear that defendant has sought to influence the testimony of Mr. Vallier in the case now pending before this Court.

(r) A coconspirator of defendant made what can be argued was a veiled threat to the safety of a witness, Michael Markovich,

indicating to Mr. Markovich in connection with this case that he should stick with "C." that the others were going to stick with "the old timers" and that Mr. Markovich should do so too if you "know what is good for you." The threat was clearly made in behalf of defendant Mancuso.

■ There is clear and convincing evidence that defendant has attempted to obstruct justice by his efforts to destroy evidence and by tampering with witnesses through bribes, threats and efforts to persuade them not to testify against him at trial.

In the view of the Court pure obstruction of justice even without more perhaps ought to be a basis to detain a defendant in Mr. Mancuso's shoes, but the law does not appear to so provide. The test rather is whether any condition or combination of conditions which may be imposed under the statute will reasonably assure "the safety of any other person and the community." Safety in the context of the problem we are analyzing here is the critical question to focus upon. It appears that the Court may consider obstruction of justice and tampering with witnesses as factors in determining the issue of safety (see *United States v. Knight,* 636 F.Supp. 1462 at 1467 (S.D. Fla.1986)), but that the law requires in addition to obstruction itself a finding of a threat to physical safety, physical or psychological coercion, threat of harm to property, economic harm or the like before the Court may find a danger to the safety of any other person or the community. Here the evidence falls short of the standard of clear and convincing evidence that there is in the Markovich threat a threat to Mr. Markovich's safety. Other than the Markovich threat, in spite of the other ample evidence of attempts to obstruct justice and tamper with witnesses, there is no evidence of danger to safety. The Markovich threat is sufficiently ambiguous to fall short of the clear and convincing standard.

We are told that the term "safety" is to be broadly construed. See *United States v. Williams,* 753 F.2d 329 (4th Cir.1985); and *United States v. Acevedo–Ramos,* 600 F.Supp. 501, 509–10 (D.P.R.1984). How-

ever, we conclude that the word "safety" should be taken to have the more usual meaning mentioned above. Obstruction of justice by itself without clear and convincing evidence of a threat to safety is not enough under the tests of the statute for the Court to conclude that defendant is a danger to the safety of another person or the community. Even these grave threats to the integrity of the judicial process are not enough under the statute to mandate detention on the basis of safety.

While 18 U.S.C. § 3142(f)(2) provides that the government is entitled to a detention hearing if the case involves a serious risk that a defendant will attempt to obstruct justice or attempt to threaten, etc., a witness it does not follow that such entitles detention unless there is a danger to safety. 18 U.S.C. § 3142(f)(1) is the proof of this contention in its similar requirement of a hearing upon motion if a case involves certain types of crimes but those facts alone are not sufficient in and of themselves to mandate detention.

The Court therefore concludes that on the basis of the evidence we must consider, there is not clear and convincing evidence to conclude that defendant is a danger to any other person or the community and defendant therefore may not be detained on that basis.

■ The Court should next consider the issue of whether defendant should be allowed to post as a property bail bond two million dollars in value of property owned by him which has been seized for forfeiture by the government in connection with this case.

It is argued by the government that since the property has been seized for forfeiture it is not subject to defendant's use to post as bail or for any other private use of defendant. It appears to the Court, however, that the essential question is whether the posting of this property for bail will reasonably assure defendant's appearance at further court proceedings and as may otherwise be ordered in connection with this case. The property is not lost at this point to defendant. It is merely tied

up. Encumbered property may in appropriate circumstances be used for bail.

If defendant flees, he will give up his chances of recovering the property. The question is how things look from defendant's viewpoint as he perceives them. The Court must ask whether the posting of the property will provide a sufficient incentive to persuade defendant not to flee. Defendant has a residual interest in the property the value of which may depend upon the odds as to whether he will be convicted or not, and whether the property may be declared forfeited to the government by verdict of the criminal trial jury or through some sort of civil forfeiture.

It is clear that the posting of the property has some effect of securing defendant's appearance and the question is whether the posting of the property will provide a reasonable assurance that defendant will not flee.

If defendant flees, he will lose the property. If he goes to trial and is acquitted, he might still lose the property through a civil forfeiture unless res judicata bars such disposition.

If defendant goes to trial and is convicted and the jury finds that his property should be forfeited, he will lose it. However, the jury might convict him of the crime but still find that the property should not be forfeited or be unable to agree on forfeiture as to a particular piece of property.

As the trial proceeds, defendant's situation may change as his chances from his viewpoint become greater for conviction or for acquittal.

The Court should also weigh into this equation the presumption of innocence and the presumption that defendant should be released from custody if conditions of release can be fashioned which will reasonably assure that a defendant will not flee. The Court should also consider the admonition that detention statutes are to be read narrowly.

All in all, however, we return to the essential basic question of whether the posting of the property in the circumstances of this defendant's case will reasonably assure his appearance.

In the circumstances of this case and without deciding whether seized property as an abstract matter might be permitted to be posted for bail, the Court concludes that the effect of the posting of the seized property as a means of reasonably assuring defendant's appearance is uncertain. It simply cannot be concluded in these circumstances that the posting of this property will reasonably assure his appearance.

Defendant also offers to post for bail additional property apparently belonging to others of a claimed value of $1,000,000 not encumbered by any seizure for forfeiture by the government. However, in view of the circumstances of this case, the grave penalties defendant faces, and the large sums of money which defendant still appears to control and which the government has not been able to seize, the proposed additional property bond would not reasonably assure that defendant will not flee if he is not detained.

The Court finds by a preponderance of the evidence that if released defendant may flee and that he poses a grave risk of flight if not detained.

The Court further finds that there are no conditions or combination of conditions which may be imposed upon defendant to assure his appearance at further proceedings herein.

The foregoing shall constitute findings of fact and conclusions of law for the purposes of deciding this motion and are based upon the evidence adduced and proffered before the Court in connection with said motion.

IT IS, THEREFORE, HEREBY ORDERED that defendant shall be detained pending trial. The Magistrate's order dated November 1, 1989, for release of defendant is REVOKED.